UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | Civil Action No. WMN 09-02569 |
| v. | ) ) ) | |
| LIFE TECHNOLOGIES CORPORATION, | ) ) ) | |
| Defendant. | ) ) ) | |

<u>EEOC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

# Table of Contents

| | | | |
|---|---|---|---|
| **I.** | **INTRODUCTION** | | 1 |
| **II.** | **PLAINTIFF'S STATEMENT OF FACTS** | | 1 |
| | A. | Douglas Scrivnor and His Employer | 1 |
| | B. | Scrivnor's Communication Capability | 4 |
| | | 1. Scrivnor's use of American Sign Language | 4 |
| | | 2. Scrivnor's Speech Reading Capability | 4 |
| | C. | The Role of Meetings at Life Technologies | 6 |
| | D. | Scrivnor's Requests for an Accommodation and Defendant's Response | 7 |
| | | 1. Scrivnor's Requests | 7 |
| | | 2. Despite Scrivnor's Requests for an Accommodation, Defendant Discontinued Sign Language Interpretation at Safety Meetings | 8 |
| | E. | Scrivnor's Charge and Defendant's Continued Failure to Provide Needed Sign Language Interpretation | 9 |
| | | 1. The Charge | 9 |
| | F. | Defendant's Alternatives to Sign Language Interpretation | 10 |
| | | 1. The use of One-on-One Meetings as an Alternative Accommodation | 10 |
| | | 2. The use of Written Materials as a Substitute for Sign Language Interpretation | 11 |
| **III.** | **ARGUMENT** | | 12 |
| | A. | Summary Judgment Standard | 12 |
| | B. | Defendant Refused Scrivnor a Reasonable Accommodation | 12 |

| | | | |
|---|---|---|---|
| | 1. | Prima Facie Case | 12 |
| | 2. | Defendant's Ineffective Accommodations Inherently are not Reasonable Accommodations | 14 |
| | 3. | Scrivnor's Successful Job Performance Despite Lack of Accommodation Does Not Excuse Defendant's Refusal to Accommodate | 21 |
| C. | | No Record Evidence Supports Defendant's Undue Hardship Defense | 29 |
| **IV.** | | **CONCLUSION** | 36 |

## I.  <u>INTRODUCTION</u>

At issue is whether Defendant, a biotechnology company engaged in the manufacture and distribution of materials for genetic research, discriminated against Douglas Scrivnor, who is deaf, by refusing him interpreters for meetings and trainings including those relating to hazardous materials, emergency evacuations and other safety issues.  Defendant also denied Scrivnor interpreters for meetings providing essential information such as work rules and procedures.  The Equal Employment Opportunity Commission ("the EEOC" or "the Commission") maintains that Defendant clearly violated Title I of the Americans with Disabilities Act of 1990 ("the ADA") by refusing to provide reasonable accommodations to Scrivnor.  On July 7, 2010, the Defendant filed a motion for summary judgment.  The Commission hereby opposes Defendant's Motion for Summary Judgment and simultaneously moves for partial summary judgment finding that Defendant violated the ADA by failing to provide Scrivnor with an interpreter for staff meetings, scheduled training sessions and personnel related meetings and finding that Defendant has not demonstrated a material issue of fact regarding its undue hardship defense.

## II.  <u>PLAINTIFF'S STATEMENT OF FACTS</u>

A.  <u>Douglas Scrivnor and His Employer</u>

Douglas Scrivnor is an employee of Defendant.  (PX1 Deposition of Douglas Scrivnor, hereinafter "PX1 Scrivnor Depo." at 45, l. 19, to p. 46, l. 1).  Scrivnor has had no hearing since the time of his birth.  (*Id*. at 17, l. 12-17).  His speech is generally not intelligible.  (PX2

Deposition of Dr. Scott Bally[1] Volume II, hereinafter  "PX2 Bally II " at 122, l. 20 to p. 124, l. 6).

Defendant operates globally and has 9000 employees.  (PX3 Deposition of Uma Hoffmann[2], hereinafter "PX3 Hoffmann" at 23, l. 7-11).  It has facilities throughout the United States and enjoys three billion dollars in annual sales.  (*Id.* at 22, l. 7-11; p. 99, l. 19 to p. 100, l. 9).  There are 300 employees at Defendant's Frederick, Maryland facility.  (*Id.* at 251, l. 1-8).

Scrivnor started at Defendant's Frederick, Maryland facility as a materials handler in 2006, and remains in that position.  (PX1 Scrivnor Depo. at 45, l. 19 to p. 46, l. 6; p. 51, l. 14 to p. 52, l. 11).  Scrivnor's primary job duty is to pick and package products for shipment. (Deposition of Corporate Designee, hereinafter "PX4 30(b)(6)" at 11, l. 2-19).

There are numerous safety hazards at the Frederick, Maryland facility.  Scrivnor works with products that are toxic, corrosive and flammable, as well as products that are irritants.  (PX5 Deposition of Roderick Williams,[3] hereinafter, "PX5 Williams" at 26, l. 1-11; PX6 Deposition of Brian Satterfield,[4] hereinafter "PX6 Satterfield" at 37, l. 17 to p. 38, l. 1).  Other hazards include ergonomics, electrical hazards and machine guarding.  (PX6 Satterfield at 34, l. 12-17).  The machine guarding issues involve the conveyor system used in the distribution department: the rollers that transport product down the line have "pinch points."  (*Id.* at 37, l. 9-16).  The electrical issues involve maintaining proper clearance while working around electrical panels. Proper clearance is necessary to prevent an arc or sparking and ultimately a fire.  (*Id.* 37, l. 1-8).

---

[1] Dr. Scott Bally, an Associate Professor of Audiology and Speech Language Pathology at Gallaudet University, is a testifying expert retained by Defendant.

[2] Uma Hoffmann served as Human Resources manager at the Frederick facility between April, 2007 and January, 2010.  (PX3 Hofmann 25, l. 4-9 and p. 56, l. 12-15).

[3] Roderick Williams is a Logistics Supervisor at the Frederick facility who directly supervised Scrivnor for several years.  (PX5 Williams at 12, l.16-18 and p. 13, l. 4-11).

[4] Brian Satterfield is environmental health and safety manger for Defendant.  (PX 6 Satterfield at 31, l. 20 to p. 32, l. 2).

Scrivnor is required to package biohazardous materials.  (PX5 Williams at 39, l. 11-13). The biohazardous materials he handles contain the portion of a virus that remains after removal of the infectious elements.  (PX4 30(b)(6) at 34, l. 15-18).  One of the products Scrivnor picks for shipping is SVC RNAI LENTIVIRUS 1 ML, 1-24.  (PX4 30(b)(6) at 10, l. 3 to p. 11, l. 1; p. 14, l. 2-6; Exhibit 2 to the Deposition of the Corporate Designee Hereinafter, "PX 30(b)(6) at Ex. 2").  This product is biohazardous because it contains genes that could create an oncogene.  (*Id.* at 13, l. 1-7).  An oncogene is a gene that can mutate a cell and cause a tumor.  (*Id.* at 40, l. 7- 10).  The tumors created by an oncogene can be malignant.  (*Id.* at 13, l. 8-15).

Scrivnor also picks LENTI CTRL HU LAMIN MIR + GFP, another product that contains oncogenes.  (*Id.* at 36, l. 17 to p. 37, l. 14; p. 37, l. 15 to p. 38, l. 11; PX 4 30(b)(6) at Ex. 9).  This product is designed for insertion into human cells.  (*Id.* at 37, l. 15 to p. 38, l. 11). Scrivnor works with SVC LENTI CTRL GFP-NEGMED-MIR, another product containing oncogenes which is unique in that it does not contain penicillin or streptomycin, which are contained in the other oncogene bearing products he prepares for shipment.  (*Id.* at 27, l. 7 to p. 29, l. 17 & PX4 30(b)(6) at Ex. 5).  Scrivnor handles six other products with oncogenes.  (*Id.* at p. 16, l. 16 to p. 17, l. 15; p. 18, l. 1-4; p. 20, l. 12 to p. 21, l. 6; p. 21 l. 8 to 21; p. 30, l. 17 to p. 32, l. 12; p. 32, l. 15 to p. 34, l. 14; p. 34, l. 19 to p. 36 l. 16; p. 38, l. 12 to p. 39, l. 12; PX4 30(b)(6) at Ex. 3, 4, 6, 7, 8 & 10).  Defendant has never informed Scrivnor that he works with oncogenes.  (PX7 Affidavit of Douglas Scrivnor, hereinafter, "PX7 Scrivnor Aff." at 15).

B.  Scrivnor's Communication Capability

    1.  Scrivnor's Use of American Sign Language

    Douglas Scrivnor communicates through American Sign Language (ASL).  (PX1 Scrivnor Depo. at 17, l. 18-20).  ASL has an entirely different language base than English.  (PX8 Deposition of Dr. Bally Volume I, hereinafter "PX8 Bally I" at 78, l. 2 to p. 80, l. 7).  It is a picture related visual/spatial language.  For example, concepts such as "fish" are modified to "big fish" by making the sign for "fish" over a larger space.  (*Id.*)  ASL is devoid of articles and has a different word order.  (*Id.*)  Its grammar includes "classifiers" which enable the signer to do things such as communicate the word "battery" by making the sign for the letter "B" and the sign for electricity at the same time.  (*Id.*)  For Scrivnor, who was born deaf, English is a second language.  (*Id.* at 80 l. 12-14).[5]

    2.  Scrivnor's Speech Reading Capabilities

    Speech reading is lip reading coupled with other adaptive strategies.  (PX8 Bally I 31, l. 14 to p. 33, l. 7).  It incorporates all of the receptive communication skills an individual uses to interpret communication such as visual and cognitive skills.  (*Id.*)  Speech reading is deciphering human speech through lip reading, body language, gestures, facial expression and cognitive skills.  (*Id.*)

    Scrivnor's speech reading ability is limited and diminishes as the language he is attempting to speech read becomes more difficult.  (PX8 Bally I at Ex. 4 p. 5).  Scrivnor's best

---

[5] Scrivnor has difficulty with written English.  (PX7 Scrivnor Aff. at 13).  An SAT reading comprehension test administered by Scrivnor's high school revealed that he comprehended written material at a second grade level at the time of graduation.  (Defendant's Exhibit E at page 5).  People who are deaf read at a low level due to lack of auditory input.  (Bally I at 86, l. 3-16).  While this evidence is relevant to the broader case, it is not germane to this motion at this time.  As argued below, the written materials given to Scrivnor by his employer as an alternative to sign language interpretation omit key information such that no person of any reading level could have received the necessary information.  For this reason, there is no issue of material fact regarding the ineffectiveness of these purported accommodations.

speech reading abilities occur at the word or phrase level where there is situational context, such as someone giving directions for a specific task using gestures.  (*Id*.)

Because Scrivnor has never been able to hear, he has no auditory memory to enable him to recognize or comprehend words.  (PX8 Bally I at 92, l. 2 to p. 93, l. 18; PX8 Bally I at Ex. 4 p.5).  He lacks a "linguistic inventory," including vocabulary and knowledge of sentence structure.  (*Id.*)  Generally, people who have never had hearing, including Scrivnor, learn to recognize a few words or phrases, which they may or may not understand, and make appropriate responses.  (*Id.*)

Even when Scrivnor's successful performance at work is factored into the analysis, it is apparent that his speechreading will only be effective in limited situations.  (*Id*. at 18, l. 1-21).  While Scrivnor can speech read a few words, his ability to do this will be dependent on the context in which the communication is happening.  (*Id*. at 66 l. 17, to p. 67 l. 5).  Even in an ideal context, his limited ability to speech read is compromised when the speaker uses "a more sophisticated language level using terminology or language that he's not familiar with."  (*Id*. at 89, l. 5-10).

In a meeting, Scrivnor is "lost in short order."  (PX8 Bally I at 69, l.12 to p. 70, l. 5).  This is because speech reading is dependent on focusing on a particular topic of discussion and context.  (*Id*. at 70, l. 6-10).  Scrivnor can only speech read when the speaker presents information in a familiar context.  (*Id*. at 88, l. 9 to p. 89, l. 4).  Even with context, when the linguistic level is more sophisticated it is difficult for Scrivnor to understand.  (PX2 Bally II at 130, l. 18 to p. 131, l. 19).  For Scrivnor, "[c]ommunication with hearing people may be best achieved through the written word or the use of an interpreter."  (PX8 Bally I at 93, l. 19 to p. 94, l. 4: PX8 Bally I at Ex. 4 p. 5).  The use of an interpreter is appropriate:

When there is long discourse, when there is a lot of communication going on. In the lecture, in a meeting. When there is a meeting, where there is multiple people talking and the conversation is going from one person to another. These are all really challenging kinds of situations, especially given his speechreading limitations. (*Id*. at 94, l. 5-13).

C. The Role of Meetings at Life Technologies

Defendant values the opportunity to talk directly with its employees. (PX3 Hofmann at Exhibit 2 to the Deposition of Uma Hoffman, hereinafter "PX3 at Hofmann Ex. 2"). Defendant holds meetings to promote "growth and understanding for employees as well as management." (PX3 Hoffman at 60, l. 3-12; PX3 Hoffmann at Ex 2). Meetings at Life Technologies create the opportunity for employees to ask questions and receive answers. (*Id*. at 59 l. 17 to p. 60, l. 2).

Defendant holds safety meetings, startup meetings, department meetings and all employee meetings. (PX5 Williams at 27, l. 3-12). Startup meetings occur daily at 1:00 p.m.. (*Id*. at 31, l. 10-15; PX9 Deposition of Adolfo Martinez[6], hereinafter "Martinez," at 26, l. 7-16). During these meetings Scrivnor's supervisors discuss safety issues, provide an update on the number of orders shipped in and out, and discuss any changes in shipping procedures. (PX5 Williams at 32, l.15-21). They are the primary form of communication between management and employees. (PX10 Deposition of Chad Simpson[7], hereinafter "PX 10 Simpson," at 24, l. 8-21). Departmental meetings and all employee meetings are less frequent and communicate information to larger groups of employees. (PX5 Williams at 28, l. 4 to 6; p. 33, l. 12-16). Defendant typically holds departmental meetings between 1:00 and 2:00 pm. (*Id*. at 32, l. 3-14). All employee meetings discuss the overall welfare of the company. ( *Id*. at 33, l. 12-16).

In September 2009, Defendant began regular employee "huddle" meetings to

---

[6] Adolfo Martinez is a Senior Manager in distribution. Chad Simpson, Scrivnor's current supervisor, reports directly to him. (PX9 Martinez at 17, l. 9-13).
[7] Chad Simpson is a supervisor in distribution. He is Scrivnor's current supervisor. (PX10 Simpson at 11, l. 4-8).

6

discuss production related goals, problems or concerns.  (PX1 Scrivnor Depo. at 104, l. 17-21).

Huddle meetings occurred on a weekly basis.  (PX10 Simpson at 30, l. 13 -21).  They were

important meetings that relayed information to employees so that they understood "where they

were from a process standpoint."  (PX3 Hofmann 72, l. 14 to p. 73, l. 2).

Safety is the most important priority at Life Technologies.  (PX10 Simpson at 35, l. 13-

18).  Safety is the first topic at every startup meeting.  (PX9 Martinez at 27, l. 8-14).  Defendant

holds safety meetings, usually after the startup meeting.  (PX5 Williams p. 31, l. 13 to p. 32, l. 2).

Safety meetings are the primary vehicle for communicating information on safety.  (PX10

Simpson at 37, l. 6-11).  The meetings take place roughly once a month.  (PX6 Satterfield at 57,

l. 5-14).  All of the safety meetings are important and attendance is mandatory.  (PX9 Martinez at

35, l. 13-14; PX3 Hofmann 124, l. 7-10).  Scrivnor is responsible for using proper packaging

technique and he must know what to do should a package break open.  (PX10 Simpson at 36, l.

11-20).  Scrivnor can be disciplined for violating a safety rule even if no accident occurs.  (PX5

Williams at 56, l. 2-8).  With regard to safety, Defendant holds Scrivnor to the same standard as

any other employee.  (PX9 Martinez at 40, l. 19 to p. 41, l. 11).


D.  Scrivnor's Requests for an Accommodation and Defendant's Response

1.  Scrivnor's Requests

In late 2006, Scrivnor requested that Defendant provide him with sign language

interpretation for staff meetings, trainings and personnel-related meetings.  (PX3 Hofmann 115,

l. 6-14; Defendant's Exhibit R at 5-6).  Scrivnor requested daily sign language interpretation.

(PX3 Hoffmann at 143, l. 18 to p. 144, l. 1).  Scrivnor made the request because he wanted to

receive the same level of information that his co-workers were receiving, and to receive

assistance with the hazardous materials meetings.  (PX1 Scrivnor Depo. at 113, l.6-14; p. 79, l. 6-9).

2.  Despite Scrivnor's Requests for an Accommodation, Defendant Discontinued Sign Language Interpretation at Safety Meetings.

In response to Scrivnor's requests for an accommodation, Defendant represented to Scrivnor that it would provide him with a sign language interpreter for some meetings and training sessions.[8]  (Defendant's Exhibit R at 6).  Despite this representation, Defendant discontinued sign language interpretation at safety meetings.  Defendant has not had a sign language interpreter present at a safety meeting since January of 2007. (PX6 Satterfield at 57, l. 19 to p. 58, l. 2).  During this time, Scrivnor has gone without sign language interpretation for meetings covering topics such as ergonomics, the hazardous materials security plan, emergency evacuation training, biological spill handling and bio and chemical safety training.  (PX3 Hofmann 122, l. 8 to p. 129, l. 21).[9]

To substitute for sign language interpretation, Defendant gave Scrivnor a handout consisting of power point slides.  The power point presentations were handouts that Satterfield gave to the hearing employees at the meetings.  (PX6 Satterfield at 43, l. 4 to 20).  They are not a verbatim transcript of the meeting.  (*Id.*)  The power point slides do not contain Satterfield's examples of situations where employees were exposed to hazardous chemicals due to failure to follow proper clean-up technique.  (*Id.* at 44, l. 4-18; p. 46, l. 2-10).

Satterfield's professional experiences in this area are considerable.  He has been a safety professional since 1994 and caries board certification in that field as well as a master's degree in

---

[8] This does not appear to be an increase over what Defendant provided prior to the request for an accommodation. (Docket 19-1 p. 20 to 21 of 44).

[9] As of September, 2009, shortly after EEOC issued its Determination finding that Defendant had violated the ADA, Defendant began to hire a sign language interpreter two times month for a one-on-one meeting with a supervisor following the start-up meetings.

8

industrial hygiene. (*Id.* at 21, l. 9-12; p. 25, l. 4-8; p. 46, l. 11-13). Prior to his employment with Defendant, he worked for the Center for Disease Control and Prevention as an inspector for select agents and toxins. (*Id.* at 23, l. 13 to p. 24, l. 4). He has been involved with hundreds of chemical spills. (*Id.* at 53, l. 16-21). Missing from the power point presentations were his experience with situations in which break downs in cleanup technique resulted in exposure to employees. (*Id.* at 44, l. 19 to 46, l. 9).

E.  Scrivnor's Charge and Defendant's Continued Failure to Provide Needed Sign Language Interpretation

1.      The Charge

Having been denied an interpreter for safety-related meetings for over a year, Scrivnor filed a charge with the Equal Employment Opportunity Commission in December 2007. His charge states that Defendant discriminated against him by failing to provide sign language interpretation for staff meetings, scheduled training sessions and personnel-related meetings.[10] (PX3 Hoffmann at Ex. 4).

Upon learning of Scrivnor's charge, the human resources manager represented to Scrivnor that he would receive sign language interpretation for monthly one-on-one meetings with his supervisors. (PX3 Hofmann 194, l. 9-20; PX3 Hoffmann at Ex. 16). Despite this promise, Defendant hired no interpreters during March, April, May, July, August or September of 2008. Further, Defendant did not retain interpreters during January, March, May, July and December of 2009. (PX3 Hofmann 196, l. 12 to p. 199, l. 21). Following his charge, Scrivnor sat at meetings waiting for an interpreter to arrive, which seldom occurred. (PX1 Scrivnor Depo. at 75, l. 11 to p. 76, l. 9).

---

[10] Defendant's brief refers to several measures such as the installation of a Video Relay Service device, a TTY device, flashing light signals and signage stops. (Docket 19-1 at 25-27 of 44). Because these measures do not relate to meetings, they are not relevant in an action stemming from Scrivnor's December 2007 charge.

F.      Defendant's Alternatives to Sign Language Interpretation

    1.   The use of one-on-one meetings as an alternative accommodation

Defendant has represented to the court that Scrivnor meets one-on-one with his supervisor following startup meetings as an accommodation for his disability.  (Docket 19-1 at 20 of 44).  Scrivnor's supervisors do not always meet with him after meetings.  (PX1 Scrivnor Depo. at 76, l. 11-18; Scrivnor at 69, l. 19 to p. 70, l. 2).  One-on-one meetings between supervisors and employees are encouraged and not unique to Scrivnor.  (PX3 Hofmann 110, l. 20 to p. 111, l. 10).  When these meetings do occur, the information provided to Scrivnor is extremely limited.  (PX1 Scrivnor Depo. at 76, l. 19 to p. 77, l. 2).

Roderick Williams was Scrivnor's supervisor throughout most of Scrivnor's career with Defendant.  (PX5 Williams at 12, l. 16-18; p. 13, l. 4-11).  One-on-one meetings were not a regular event when Williams started supervising Scrivnor, but were added as time progressed.  (*Id.* at 33, l. 1 to p. 35, l. 11).  Williams does not know if Scrivnor can speech read.  (PX5 Williams at 60, l. 12-15).  Williams communicated with Scrivnor by writing him notes.  (*Id.* at 35, l. 4-18).  If details are omitted from the notes Scrivnor cannot ask about the information he did not receive.  (*Id.* at p. 69, l. 19 to p. 70, l. 4).  Williams is unable to say if writing information on paper was effective for Scrivnor.  (*Id.* at 74, l. 7-9).

Chad Simpson, Scrivnor's current supervisor, also conducts one-on-one meetings with Scrivnor using paper and pencil.  (PX10 Simpson at 32, l. 6-14).  During the one-on-one meetings, Scrivnor receives a few notes after Simpson has a lengthy talk with the hearing employees.  (PX7 Scrivnor Aff. at 11).

2.   <u>The use of Written Materials as a Substitute for Sign Language Interpretation</u>.

Defendant' intent in holding a meeting is to "pull everybody together" and share information.  (Hoffmann at 237, l.5- 10).  This is why it does not dispense with meetings entirely and provide all employees with written materials as an alternative.  (*Id.*)

The written materials Defendant provides Scrivnor following meetings are incomplete.  (PX1 Scrivnor Depo. at 110, l. 6-11).  A typical note will contain a few points to encapsulate a lengthy meeting.  (Scrivnor at 110, l. 12-18;  PX1 Scrivnor Depo at Ex. 21).  The notes are just brief summaries of the meeting.  (*Id.*)  The notes are not a transcript of the meeting; they are to give Scrivnor "key take-aways."  (PX3 Hoffmann at 243, l. 18 to p. 245, l. 1).  The notes contain general information relating to the whole company and are not customized to include details or information that may be significant for Scrivnor.  (*Id.*)

When Scrivnor receives handouts to look at during a meeting they are also incomplete.  (PX7 Scrivnor Aff. at 9).  He is unable to tell what page of the handout the speaker is discussing.  (*Id.*)  As with notes generated after meetings, they do not encapsulate all of the material presented orally.  (*Id.* at 8).

No one monitors the written materials provided to Scrivnor to see if they are complete.  (PX3 Hofmann 225, l. 17 to p. 226, l. 1).  Once Scrivnor receives written materials, the burden is on him to ask his supervisor questions if he does not understand them.  (*Id.* at 240, l. 13 to p. 241, l. 2).  He bears this burden even if the notes omit an entire section of the presentation.  (*Id.* at 224, l. 15 to p. 225, l. 10).

### III. ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Summary judgment is appropriate only if a rational trier of fact could not find for the non-moving party in light of the record as a whole.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  In making this assessment, "'plaintiff's version of the facts must be presented where the parties' versions conflict, at least to the degree that her allegations have support in affidavits, Deposition or other documentary evidence.'" *Magnuson v. Peak Technical Serv. Inc.*, 808 F. Supp. 500, 504 (E.D. Va. 1992), *quoting Paroline v. Unisys Corp.*  879 F.2d 100, 102-103 (4th Cir. 1989), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990).  The discussion below, and the evidence in support thereof, preclude the issuance of summary judgment for Defendant in this action and support an award of partial summary judgment for the Commission.

### B.    DEFENDANT REFUSED SCRIVNOR A REASONABLE ACCOMMODATION.

### 1.    Prima Facie Case

The  Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*[11] prohibits discrimination against "a qualified individual with a disability, because of the disability of such individual, in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of

---

[11] ADA Amendments Act of 2008 (Amendments Act), Pub. L. No. 110-325, 122 Stat. 3553 (2008) (codified at 42 U.S.C. § 12101) became effective January 1, 2009 and govern Defendant's conduct from that date forward.  For the sake of simplicity, the Commission's brief will refer only to the ADA because the 2008 amendments do not alter Defendant's duty to provide an accommodation.

employment." *Id.* § 12112(a).  This particular statutory scheme requires no proof of

discriminatory animus because "discrimination against the handicapped was perceived by

Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and

indifference – of benign neglect." *Alexander v. Choate*, 469 U.S. 287, 295 (1985)(Rehabilitation

Act). [12]  Moreover, Congress, through the ADA, has found that "individuals with disabilities

continually encounter various effects of ... communication barriers ..." *Id.* §12101(a)(5), thereby

suggesting that the ADA address the discriminatory effects of benign actions or inaction, as well

as intentional discrimination.

Under the ADA, the term "discriminate" includes "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability … unless [the employer] can demonstrate that the accommodation would

impose an undue hardship on the operation of the business of [the employer.]" *Id.*

§12112(b)(5)(A).  "[A]ny failure to provide reasonable accommodations for a disability is

necessarily "because of a disability" – the accommodations are only deemed reasonable (and,

thus, required) if they are needed because of the disability – and no proof of a particularized

discriminatory animus is exigible." *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252,

264 (1st Cir. 1999); *Proctor v. Prince George's Hosp. Center*, 32 F. Supp.2d 820, 829 (D. Md

1998).

Defendant is not disputing that Scrivnor is a disabled individual who is capable of

performing his job duties with or without an accommodation.  Accordingly, if Defendant is

unable to demonstrate a material issue of fact supporting its contention that it has provided

Scrivnor with a reasonable accommodation, the Commission is entitled to summary judgment on

---

[12]  "… Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation Act and its implementing regulations."  *A Helping Hand, LLC v. Baltimore County,* 515 F.3d 356, 362 (4th Cir 2008).

this issue.

**2.     Defendant's Ineffective Accommodations Inherently Are Not Reasonable Accommodations.**

Defendant prides itself on having employed various measures in facilitating

communication with Scrivnor.  In so arguing, Defendant dramatically inflates Scrivnor's speech

reading abilities, and further inflates its own efforts to bridge their communication gap.  As the

evidence discussed below demonstrates, however, Defendant's arguments are factually

unsupported.

Defendant's purported accommodations do not provide Scrivnor with all, or substantially

all, of the information from meetings.  When there is no interpreter at a meeting, Scrivnor only

has three avenues for receiving information: written materials, speech reading, and one-on-one

meetings that combine written materials and speech reading.  As made clear above, Scrivnor's

speech reading is ineffective (PX8 Bally I at 69, l. 12 to p. 70 l. 5), and as set forth below, the

written materials and one-on-one meetings similarly omit important information.

Defendant, however, has represented to the Court that Scrivnor's testimony is the best

evidence regarding his speech reading capabilities.  (Docket 19-1 at 10 of 44, footnote 3).

Scrivnor testified that he is occasionally able to read lips at work but it is not always possible.

(PX1 Scrivnor Depo. at 19, l. 9-15).  His ability to speech read depends on whether he can catch

"significant words" and he cannot speech read some people.  (*Id* at 19, l. 9-15; p. 7, l. 21 to p. 18,

l. 2).  He cannot rely on speech reading for accuracy.  (*Id.* at 23, l. 9-12).  At meetings, Scrivnor

believes that he can only catch a few words and that he is left to his own devices.  (*Id.* at 75, l.11

to p. 76, line 9). As he has made clear,

> But say you have a training class, hazardous materials, a hazmat training class, no
> interpreter.  Like if there's a lecture or training for example with the hazardous

materials, the hazmat safety training class, there's no interpreter there you understand. And so I set there watching the lecturer explain and teach and so forth, and I'm relying on speech reading. And I grab a word here, I catch a word there. I'm also relying on physical body language, demonstration, looking at the boxes of the various materials and I'm trying to figure out what is the appropriate way to handle these materials. And I think at times that I am understanding, that I am picking up. It's kind of left up to my own devices to figure out from like I say a word here or a word there. But when it's all said and done, there's no one that sets down and goes over this material with me, no. PX1 Scrivnor Depo. at 75, l. 11 to p. 76, l. 9.

Defendant retained Dr. Joseph Scott Bally[13] in March, 2010 to provide an assessment of Scrivnor's speechreading abilities. (PX2 Bally II at 111, l. 2-19; p. 112, l. 2-9). Dr. Bally concluded that Scrivnor is not a skilled speech reader. (PX2 Bally II at 129, l. 13 to p. 130, l. 17 & Exhibit 6 to the Deposition of Dr. Scott Bally Volume II, hereinafter "PX2 Bally II at Ex. 6," at Bates "Defendant 2040"). [14]

Dr. Bally performed numerous tests[15] including telling Scrivnor a story written at the third grade level. (PX8 Bally I at Ex. 4 p. 4-5). Scrivnor was unable to understand any of the story, even after multiple attempts and even though he was told the topic of the story. (*Id.*) Even at the sentence level, Scrivnor is unable to speech read consistently. He was only able to identify key words in everyday sentences 18 of 100 times. (PX8 Bally I Ex. 4 p. 4). Dr. Bally concluded that without context Scrivnor's "ability to understand words or phrases is poor. He is unable to

---

[13] Dr. Bally has worked with speechreading for 30 years and is the author of the best selling book on the topic. (PX2 Bally II at 113, l. 3 to p. 114, l. 6). In his career, he has performed thousands of speech reading assessments. (PX8 Bally I at 35, l. 21 to p. 36, l. 2). His work also includes consulting with Kodak, Xerox and other companies to train hearing employees to work better with coworkers who cannot hear.

[14] Dr. Bally's draft accompanied with draft report to Defendant with an email stating, "[u]nfortunately, it appears that this will not be helpful to your case." (PX2 Bally II at page 119, l. 1-15; PX2 Bally II at Ex. 6 at "Defendant 2034"). Following this email, Defendant suggested to Dr. Bally that he revise the report to emphasize what Scrivnor could do as opposed to what he could not do. (PX2 Bally II at 158 l. 13-19). The draft report is marked as PX8 Bally I at Ex. 4 and the final report is marked as PX2 Bally II at Ex. 6.

[15] In addition to testing, Dr. Bally took a case history from Scrivnor. (PX8 Bally II at 125, 17 to p. 127, l. 5) The case history is an essential part of the evaluation. (*Id.*). During the history, Scrivnor reported that "his greatest difficulty is in group meetings or briefings. If he sits or stands in front to see the speaker's face better he has difficulty understanding questions or comments which occur behind him. He notes that in many meetings the speaker in the front does not stand still but moves around and is difficult to follow." (*Id.* page 124, l. 19 to p. 125, l. 5).

understand utterances longer than a few words with or without context. With rapt attention he may be able to figure out the gist of what conversation is about, but none of the details." (PX2 Bally II at 130, l. 21 to p. 131 l. 5; PX2 Bally II at Ex. 6 Bates 2041). Defendant has not provided, and the record does not contain, any contrary evidence indicating that Scrivnor successfully lip-reads at meetings.

Nor do written handouts adequately inform Scrivnor of the substance of the meetings. At safety meetings, all employees, including Scrivnor, receive the same handout. (PX6 Satterfield at 43, l. 4-20). The hearing employees also receive a spoken presentation. (*Id.*) The level of detail in the notes is always inconsistent with the amount of speech that occurs during the meeting. (PX7 Scrivnor Aff. at 8). This is because important topics are only contained in the oral presentation. The handouts do not contain examples of the health and safety manager's professional experiences with improper spill cleanups that resulted in employee exposure. (PX6 Satterfield at 44, l. 4 to p. 45, l. 11; p. 46, l. 2-10). [16]

The notes from other meetings are also incomplete. Scrivnor typically receives notes that contain bullet points and summaries, that lack the detail that hearing employees receive. (PX1 Scrivnor Depo. at 110, l. 6-18; PX1 Scrivnor Depo at Ex 21; PX3 Hofmann 232, 10 to p. 233, l. 16; p. 243, l. 18 to p. 245, l. 1). A typical note contains a few bullet points to encapsulate a lengthy meeting. (PX1 Scrivnor Depo. at 110, l. 12-18; PX1 Scrivnor Depo at Ex. 21). In one instance that typifies its practice, Defendant gave Scrivnor a note telling him that the quality

---

[16] Three years after the filing of Scrivnor's charge, the Commission first learned of Defendant's newly advanced argument that Scrivnor, in an interpreted meeting between him and Safety Manager Satterfield, expressed a preference for power point handouts in lieu of an interpreter. Indeed, Scrivnor never expressed such a preference (PX7 Scrinor Aff. at 16); nor is there any invoice reflecting interpreter charges for the "early 2007" meeting during which Satterfield contends that Scrivnor articulated such a preference. (PX3 Hoffmann at 118, l. 14, to p. 119, l. 9: PX3 Hoffman at Ex. 5 at Bates "Defendant 579-580"). A sign language interpreter was hired on December 1, 2006 for a meeting on quality awareness. (*Id.*) In February of 2007 an interpreter was scheduled for a training class but then cancelled. (*Id.*) An interpreter was not hired again until Defendant retained two interpreters for a March 9, 2007 training class. (*Id.* and Scrivnor Depo. at page 86, lines 5 to 12).

policy had been reviewed at a meeting, without any further information on the subject. (*Id.*) The note did not provide any review of the policy, it merely communicated that the hearing employees had received a review. (*Id.*). On another occasion, Defendant gave Scrivnor a note stating, "Terry Coley discussed why we are using problem cards to focus on problem areas." (PX3 Hofmann at Ex. 19). Once again, the note recorded the topic of discussion but relayed none of the substance.

Because Scrivnor cannot lip-read effectively during those meetings, and the written materials do not contain all of the information, the only available avenue for Scrivnor to get the missing information is from one-on-one meetings, which combine notes and speech reading. These meetings do not assist with comprehending the safety meetings because Scrivnor's supervisors do not meet with him one-on-one following safety meetings. (PX10 Simpson at 68, l. 19-22). Further, the one-on-one meetings do not substitute for sign language interpretation at the daily start-up meetings because they do not convey all of the information given to hearing employees. (PX7 Scrivnor Aff. at 11). Every startup meeting Defendant holds addresses safety, but safety information is frequently omitted from Scrivnor's startup meeting notes. (PX10 Simpson at Ex. 1&3).[17] A note that Scrivnor received following a November 17, 2009, startup meeting has an entry stating "previous day performance" but does not say what the previous day's performance was. (PX10 Simpson at Ex. 3).

Roderick Williams, who supervised Scrivnor for years, and conducted one-on-one meetings, does not know if Scrivnor can speech read, (PX5 Williams at 12, l.16 –18; p. 13, l. 4-11; p. 59 l. 7-15; p. 60, l. 12-15), nor could he opine if writing information on paper was effective for Scrivnor. (*Id.* at 74, l. 7-9). Scrivnor however, is able to say that it was not

---

[17] PX10 Simpson Exhibits 1&3 are meeting notes signed by Scrivnor. Defendant never informed Scrivnor that his signature on these documents indicated that he understood them. (PX10 Simpson at 43, l. 13-17).

effective.  (PX7 Scrivnor Aff. at 11).  Lacking any evidence from Defendant that Scrivnor could comprehend a substantial portion of any meeting, whether start up or safety, using Defendant's half-hearted measures, there is no issue of material fact regarding the ineffectiveness of Defendant's communication.

The essence of a reasonable accommodation is that it be effective in meeting the needs of the individual employee.  As the Supreme Court stated, "the word 'accommodation' . . . conveys the need for effectiveness.  An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations."  *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (emphasis in original); *see also Zivkovic v. S. Calif. Edison Co*., 302 F.3d 1080, 1089 (9th Cir. 2002) (employer must offer accommodation that is "reasonable and effective"); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (appropriate reasonable accommodation must be "effective"); *Fleetwood v. Harford Sys. Inc*. 380 F. Supp.2d 688, 699. (D. Md. 2005)( In order to be reasonable, the accommodation must be effective.).

To determine if an employer has provided a reasonable accommodation the court must look at whether the accommodation: "(1) would be 'effective,' *i.e.*, would address the job-related difficulties presented by the employee's disability, 29 C.F.R. § 1630.2(o)(1)(i)-(ii); and (2) would allow the employee to attain an 'equal' level of achievement, opportunity, and participation, that a non-disabled individual in the same position would be able to achieve, *id*. § 1630.2(o)(1)(iii)."  *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 736 (D. Md. 1996); *cf. Champ v. Balt. Cty.*, 884 F. Supp. 991, 999 (D. Md. 1995).  Scrivnor's participation is not equal.  He is denied important information.

In *E.E.O.C. v. United Pub. Workers Am. Fed'n of State, County & Mun. Employees*, NO. 97-00381 SOM, 1999 U.S. Dist. LEXIS 22654, at *17, (D. Haw. Feb. 18, 1999)(*Attached in*

*Appendix of Cases not Generally Reported*), the Court granted summary judgment in favor of the EEOC finding that the Defendant violated the ADA by failing to provide two union members sign language interpreters for union meetings.  The court rejected the Union's argument that interpretation was unnecessary because the deaf employees could have received information from Union meetings in other forms, such as pamphlets.  *Id.* at *17, fn 5.  "The failure to provide sign language interpreters deprived Chiwa-Tanaka and Nomura of the full benefit of an activity sponsored by the Union."  *Id.* citing 29 C.F.R. § 1630.4 ("It is unlawful for a covered entity to discriminate on the basis of disability against a qualified individual with a disability in regard to: . . . (h) Activities sponsored by a covered entity including social and recreational programs; and (i) Any other term, condition, or privilege of employment").

The court further reasoned that the deaf union members "were deprived of the group discussion and explanation of their employment benefits, a privilege other Union members enjoyed."  *Id.*  In this matter, the issue is not simply full participation in meetings regarding issues of finance, but meetings regarding the daily operation of his department, and most importantly- meetings regarding personal safety.

Offering occasional interpretation and written communication has been held to be insufficient basis for granting summary judgment to the employer, particularly when, as here, the employee disputes the effectiveness of the *ad hoc* measures.  *Majtan v. Pilling Weck*, No. 99-718, 2000 WL 1386321, at *6 (E.D. Pa. Sept. 22, 2000)(jury could find that employer's providing sign language interpreter for some but not all staff meetings denied deaf employee equal privileges and benefits under the ADA);  *Serio v. New Wis. Serv.*, No. 04-C-0870, 2006 WL 2435077 at *9 (E.D.Wis. Aug. 22, 2006)(triable issue of fact regarding necessity of ASL interpretation even where employer submits evidence that written communication is effective.);

19

*Mohamed v. Mariott Int'l, Inc*., 905 F. Supp. 141, 154 (S.D.N.Y. 1995)(denying summary

judgment where sign language interpretation was denied for first meeting in investigation but

provided in subsequent steps of the disciplinary process).  *Proctor v. Prince George's Hosp.*

*Center*, 32 F. Supp.2d 820, 827 (D. Md. 1998)(denying summary judgment in rehabilitation act

public accommodations case where hospital provided sign language interpretation for some

aspects of the patient's treatment but not others: "The hospital, however, fails to provide any

case law or statutory support for the position that accommodations that only allow after-the-fact

understanding are sufficient when a hearing patient would have had greater opportunity to

benefit and participate at various stages of his care.")

 In the instant matter, Defendant prides itself for the provision of a sign language

interpreter on 24 occasions since April of 2006, less than once every other month throughout

Scrivnor's employment.  Providing Scrivnor an interpreter at one meeting does nothing to assist

him at numerous other meetings held without an interpreter.  This is particularly true when there

is no plan or rationale for the provision of interpretation services.  Current supervisor Simpson

does not know why there is an interpreter for some meetings and not others.  (PX10 Simpson at

38, l. 20 to p. 39, l. 2).  Simpson believes that human resources deals with his supervisor, Adolfo

Martinez regarding interpreters for Scrivnor.  (*Id.* at 28, l. 9 to 13).  Martinez has never met with

anyone in human resources regarding the provision of interpreters for Scrivnor because he

believes the plan for interpreters was in place before he arrived.  (PX9 Martinez at 36, l. 2-6).

But he arrived in July of 2009, before Defendant stepped up interpreter services to twice a month

beginning September, 2009.  (*Id.* at 6, l. 11-14).  Kate Rykhus, who has replaced Hoffmann as

head of human resources for the Frederick facility, like Simpson, does not know why Defendant

schedules interpreters twice a month as opposed to some other schedule.  (PX11 Deposition of

Kate Rykhus, hereinafter "PX11 Rykhus" at 27, l. 21 to p. 28, l. 4).

Defendant's attempts to accommodate Scrivnor have, at best, been *ad hoc,* have excluded

him from meetings, and have prevented him from moving beyond the point where he feels as if

he is guessing, at how to do his job.  (PX7 Scrivnor Aff. at 5).  Defendant paints a rosy picture of

Scrivnor's work-life but the truth is that Scrivnor experiences frustration and anger to the point

where he has become sick from the stress of his job and missed work as a result.  (PX1 Scrivnor

Depo. at page 73, l. 8-13).  Defendant is not entitled to summary judgment in its favor.  The

third-grade level story that Dr. Bally used to test Scrivnor, and Scrivnor could not decipher, was

about baseball, (PX8 Bally I at 83, l. 5 to p. 87, l. 12;PX8 Bally I at Ex. 4 p. 4-5), but

Defendant's untranslated trainings are on topics such as ergonomics, the hazardous materials

security plan, emergency evacuation training, biological spill handling and bio and chemical

safety training.  (PX3 Hofmann 122, l. 8 to p. 129, l. 21).  The dangers Scrivnor faces are real,

and Defendant's breezy characterization of Scrivnor's relative success at the company are

precisely the type of benign neglect that the ADA is intended to combat.


### 3.   Scrivnor's Successful Job Performance Despite Lack of Accommodation Does Not Excuse Defendant's Refusal to Accommodate.

Defendant has argued that its purported accommodations must be effective because

Scrivnor can perform the functions of his position.  (Document 19-1 at 31 of  44).  There is no

evidence, however, that his relative success is *because* he is absorbing information at meetings.

Mere speculation by the non-moving party cannot stave off a properly supported motion for

summary judgment.  *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985).  That Scrivnor can

perform his job is because in truth, he trains himself by watching others.  (PX7 Scrivnor Aff. at

5).[18]

To avoid addressing the substance of this suit, and create the illusion that Scrivnor is getting the information he needs, Defendant advances arguments regarding Scrivnor's interpersonal communications with co-workers over simple subjects.  (Docket 19-1 at 10-12 of 44).  Scrivnor has not requested an accommodation for communications with co-workers outside of meetings and such an accommodation is not an issue in this suit.  Nor can Defendant's arguments that Scrivnor can engage in some interpersonal communication with Uma Hoffman,[19] Roderick Williams,[20] Michael Lango,[21] Adolfo Martinez,[22] Chad Simpson,[23] Brian Satterfield[24] and Merle Coblentz[25] establish that Scrivnor understands more complex subjects presented in larger meetings.  Defendant does not explain how these individuals could possibly know what Scrivnor actually comprehends, beyond simple instructions, or the questions Scrivnor would ask at meetings if he could fully understand the communication at meetings.  Defendant relies on anecdotes about Scrivnor requesting a new keyboard, but Scrivnor has a legal right to participate in maters of greater complexity, particularly when his safety is at issue.

---

[18] The failure to communicate at meetings has had an objective impact on Scrivnor.  As an example, he has been reprimanded for failing to follow instructions presented at startup meetings during which employees were ordered to inform a supervisor before they left their workstations.  (PX12 Deposition of Michael Lango, hereinafter, "PX12 Lango" at 35, L. 18 to p. 37, l. 20; PX12 Lango at Ex. 1).

[19] Hofmann has no training on deaf communications and had no experience working with deaf employees.  (PX3 Hofmann at 38, l. 20 to p. 39, l. 2: p. 42, l. 9-14).  She testified that she is not qualified to analyze the effectiveness of an accommodation for a disability.  (Id. at p. 223, l. 8 to page 224 l. 2).

[20] Williams has received no training regarding communicating with people who are deaf and no training on the American's with Disabilities Act.  (PX5 Williams at 7, l. 21 to p. 9 l. 20; p. 64, l. 13-15).  He does not know if Scrivnor is capable of speech reading.  (Id.at 12, l.16 –18; p. 13, l. 4-11; p. 60, l. 12-15)

[21] Lango has had no training on communicating with people who are deaf.  (PX12 Lango at 18, l. 1-5).  Like Williams, Lango does not know if Scrivnor can read lips.  (Id. at 35, l. 4-5).

[22] Martinez has had no training on communicating with people who are deaf.  (PX9 Martinez at 8, l. 21 to p. 9 l. 3).

[23] Simpson has had no training on communicating with people who are deaf.  (PX10 Simpson at 8, l. 19 to p. 9, l. 1).

[24] Satterfield has had no training on communicating with people who are deaf.  (PX6 Satterfield. at 30, l. 16-19).

[25] Coblentz has had no training on communicating with people who are deaf, and is unsure if he received training on the American's with Disabilities Act.  (PX13 Deposition of Merle Coblentz,, hereinafter "PX13 Coblentz" at 7, l. 16-19; p. 32, l. 4-6).

Defendant's argument that Scrivnor performs his duties effectively and therefore, no further accommodation is necessary, only demonstrates its misunderstanding of the law.  Even if it could be assumed that understanding safety rules and other information disseminated at meetings is not an essential function of Scrivnor's position, the ADA provides for the provision of accommodations to persons who can perform the essential functions of their jobs.  The ADA prohibits discrimination against a "qualified individual… on the basis of disability in regard to. . . , job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

The statutory definition of reasonable accommodation includes a range of examples, including providing interpreters, but nowhere states reasonable accommodations are necessary only for the performance of essential job functions.  42 U.S.C. § 12111(9).  To be sure, an employer may have to make accommodations to enable an employee to perform essential job functions, 42 U.S.C. § 12111(8), but the ADA's coverage extends more broadly to ensure that disabled individuals have full access to the benefits and privileges of employment.  *See* 42 U.S.C. § 12112(a); s*ee also* 42 U.S.C. § 12112(b)(1) (prohibiting, limiting or segregating individuals because of disability).

The Commission has issued regulations addressing this issue.  These regulations are authorized by 42 U.S.C. § 12116, and as such are entitled to deference.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("considerable weight should be accorded to an [agency's] construction of a statutory scheme it is entrusted to administer"); *cf. Sutton v. United Air Lines, Inc*., 527 U.S. 471, 478 (1999).  Congress has explicitly delegated to the EEOC the authority to make specific policy determinations regarding the ADA, and courts must give these determinations controlling weight unless they are "arbitrary, capricious, or

manifestly contrary to the statute." *Price v. Nat'l Bd. of Med. Examiners*, 966 F.Supp. 419, 425

(S.D.W.Va. 1997) (*quoting  ABF Freight Sys., Inc. v. NLRB,* 510 U.S. 317, 324 (1994)( *internal*

*citations omitted.*))

The EEOC's ADA regulations, drawing from the statutory language, clarify that the term

"reasonable accommodation" extends beyond adjustments that enable an individual to perform

essential job functions.  The EEOC regulations provide, in relevant part, that:

(1) The term *reasonable accommodation* means:

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to
enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated
employees without disabilities.

29 C.F.R. § 1630.2(o).

"Regulations, like statutes, are interpreted according to canons of construction.  Chief

among these canons is the mandate that 'constructions which render regulatory provisions

superfluous are to be avoided.'" *Black & Decker Corp. v. C.I.R.,* 986 F.2d 60, 65 (4th Cir.1993)

(*quoting Hart v. McLucas,* 535 F.2d 516, 519 (9th Cir.1976)).  Summary judgment in the

Defendant's favor would render this regulation superfluous.

Defendant's argument that "[t]he EEOC apparently seeks to impose a new standard in

this case – that employers must accept the preferred accommodation of a disabled employee even

when the employee is already performing the essential duties of his or her job without it" is

factually and legally unfounded.  *See* (Docket 19-1 p. 31 of 44).  First, this action is not about

Scrivnor's preference in accommodations; it is about accommodations that are effective.

Second, the law EEOC advances is well established.  Contrary to Defendant's argument, no

extension of the law is required.

In *Buckingham v. United States*, 998 F.2d 735, 741 (9th Cir. 1993), the Court held that,

24

under the Rehabilitation Act, "employers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job."  Instead, qualified individuals "may require reasonable accommodation to allow them to . . . enjoy the privileges and benefits of employment equal to those enjoyed by non-[disabled] employees."  (holding employee able to perform essential job functions nonetheless may be entitled to reasonable accommodation of a transfer so he can receive better medical treatment); *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992)("The Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives, not merely accommodations that facilitate the performance of specific employment tasks.") *See also MCI Telecomm. Corp.*,  993 F.Supp. 726, 729-30(D. Ariz. 1998) (employer violated ADA by failing to provide wheelchair-accessible bus to transport employee to off-site company meeting).

In *Majtan,* 2000 WL 1386321, at *6 the court held that, "[d]efendant argues that plaintiff did not need an interpreter for those meetings at which none was provided to perform the essential functions of his job.  That plaintiff did not require an interpreter to perform the essential functions of his job, however, does not relieve defendant of the obligation to accommodate his disability."  The plaintiff was a deaf employee who had received favorable performance reviews for seven consecutive years.  *Id*. at *2.  He had some lip reading ability but struggled to speech read during meetings.  *Id.* at *2.  He was unable to understand much of what went on at meetings because of the speed at which the presenters spoke.  *Id*.  Despite his requests, his employer failed to provide a sign language interpreter at four of nine company meetings.  *Id.*  The court denied the employer's motion for summary judgment.

Defendant goes to great length to distinguish *E.E.O.C. v. Federal Express Corp.*  513 F.3d 360 (4th Cir. 2008)(defendant's failure to *inter alia* provide a deaf employee complete notes

or a sign language interpreter for staff meetings supported an award of punitive damages).  While the case relates to punitive damages, not yet at issue here, implicit in the court's holding was the employer's duty to accommodate the employee notwithstanding his adequate performance.  *Id.* at 337.

The Fourth Circuit precedent relied upon by Defendant does not hold that an employer need not provide an accommodation for non-essential functions.  *See* Docket 19-1 p. 31 of 44 citing *Doyle v. Rite Aid Corp.*  No. RDB-08-1106, 2010 WL 445387 (D. Md. Feb. 1, 2010) (manager could not perform essential job functions); *Myers v. Hose*, 50 F.3d 278 (4th Cir. 1995) (duty to reasonably accommodate a disabled employee, who is presently unqualified for the position he holds, does not include the obligation to grant the employee an indefinite period of time to correct his disability.); *Dicksey v. New Hanover County Sheriff's Dept.*, 522 F. Supp. 2d 742, 748 (E.D.N.C. 2007)(Sheriff's deputy was not qualified for position due to sudden and unpredictable seizures and placement in a day shift position was not a reasonable accommodation when no such position was available.)

Defendant's reliance on *Kiel v. Select Artificals, Inc.*, 169 F.3d 1131, 1136-37 (8th Cir. 1999) is also misplaced.  In *Kiel* a divided Eighth Circuit, sitting *en banc,* affirmed summary judgment on a deaf office worker's accommodation claim where the employee was denied an interpreter for social gatherings but was provided an interpreter on the one occasion when there was a meeting relevant to his position.  *Id.* at 1134, 1137.  *But see Id.* at 1139 (court erred in holding plaintiff was reasonably accommodated as a matter of law where "record reveals that, as to employee meetings, [plaintiff] was not provided with an interpreter and, arguably therefore, a way to function meaningfully as an employee.") (Morris Sheppard Arnold, J., dissenting).

Moreover, the *Kiel* court acknowledged that a "reasonable accommodation should

provide the disabled individual an equal employment opportunity, including an opportunity to attain the same level of performance, benefits, and privileges that is available to similarly situated employees who are not disabled." *Id.* at 1137 citing 29 C.F.R. § 1630.9 (Appendix) (1998). Respectfully, the court's decision was flawed, as it offered no analysis of how its decision was consistent with the regulation.

The *Kiel* plaintiff was provided an interpreter for the one workplace meeting that related to his position. *Id.* at 1134, 1137. Here, Defendant routinely denies Scrivnor an interpreter for meetings relevant to his position and his personal safety. (PX6 Satterfield at 57, l. 19 to p. 58, l. 2)(no interpreter at safety meetings since 2007). *Kiel* is distinguishable because the court did not reach the question of providing an accommodation when employee safety is at issue. Because it is unsupported by the language of the statute and the EEOC regulations, has not been expressly adopted by the Fourth Circuit, and is distinguishable on the facts, *Kiel* should not be followed.

Further, courts within the Eighth Circuit have declined to follow *Kiel* in situations similar to the present case. In *Meyer v. Iowa Mold Tooling Co.*, 141 F.Supp. 2d 973, 986 (N.D. Iowa 2001), also relied upon by Defendant, the court denied summary judgment where the employer failed to provide an interpreter for meetings that did not relate to the essential functions of the plaintiff's employment. The court held that because the meetings were mandatory, involved legal mandates for workplace conduct, such as harassment, or related more generally to his position, there was a duty to accommodate. *Id.* In the instant case, the meetings are also mandatory. (PX9 Martinez at 35, l. 13-14; PX3 Hofmann at 124, l. 7-10). Scrivnor's managers discuss safety first at every startup meeting. (PX9 Martinez at 27, l. 8-14). Scrivnor is subject to discipline for violating a safety rule even if no accident occurs. (PX5 Williams at 56, l. 2-8). Defendant does not dispute that the meetings in question relate to Scrivnor's employment.

Accordingly, *Meyer* is a more applicable precedent than *Kiel.*

The other out of circuit precedents cited by Defendant do not establish that an employee is not entitled to an accommodation to understand safety or job-related meetings. *See,* Docket 19-1 at 32 of 44, citing *Reith v. TXU Corp.* No. 4:05CV33, 2006 WL 887413 (E.D. Tex. April 4, 2006) (accommodation not required for office worker where meetings will not help with assigned tasks, meetings have information regarding only future assignments and the office worker is not eligible for those assignments.); *EEOC v. UPS Supply Chain Solutions*, No. CV 06-6210, 2008 WL 6747392 (C.D. Cal. Sept. 18, 2008), *appeal pending* Ninth Circuit Case No. 08-56874 (safety not at issue); *Jones v. Wal-Mart Stores, East, L.P.* No. 3:07-CV-461, 2009 WL 1588656, at *1, 3, 5 (E.D. Tenn. June 5, 2009) (unopposed motion for summary judgment granted against *pro se* litigant. Portions of the claim were time barred. *Pro se* litigant made no argument regarding the content of the meetings.) Indeed, *Campbell v. Wal-Mart Stores, Inc.*, 272 F. Supp. 2d 1276 (N.D. Okla. 2003), also relied on by Defendant, squarely supports the Commission's position. In *Campbell,* the court *denied* summary judgment where "[p]laintiff's job encompassed not only plaintiff's ability to sort hangers and fold clothes, but also her ability, at least on some basic level, to communicate with management and co-workers in order to comprehend the changes occurring around her. Plaintiff's contention that the purpose of a reasonable accommodation is not merely for the performance of job functions, but also to enable employees to 'enjoy the privileges and benefits of employment' is well-taken.'" *Id.*

Moreover, EEOC regulations provide that "[i]t is unlawful for a covered entity to discriminate on the basis of disability against a qualified individual with a disability in regard to… [a]ctivities sponsored by a covered entity including social and recreational programs… and [a]ny other term, condition, or privilege of employment." 29 CFR § 1630.4 (I)(J). Here,

Defendant is not discriminating against Scrivnor concerning mere social or recreational programs, but concerning safety trainings and shift meetings that address safety and other work related topics. These meetings are central to his continued employment with the company and his physical safety. That Scrivnor *has* not had an accident is no guarantee that he *will* not have an accident.

The Commission does not seek to establish a new standard but to receive a ruling in accord with nearly twenty years of decisional and regulatory authority. Scrivnor's successful performance, thus far, does not relieve Defendant of its duty to translate safety and other work related information for a deaf employee who ships biological materials with cancer causing agents.

## C.   NO RECORD EVIDENCE SUPPORTS DEFENDANT'S UNDUE HARDSHIP DEFENSE.

Defendant has represented to the court that it now provides interpreters "for most scheduled trainings." (Docket 19-1 at 24 of 44). Its success in implementing this accommodation is ample evidence that Scrivnor's requested accommodation is not an undue hardship. As with all affirmative defenses, the ultimate burden of proving "undue hardship" remains at all times with the defendant. *Bryant*, 923 F. Supp. at 738. "Undue hardship cannot be proved by assumptions nor by opinions based on hypothetical facts:"

> [T]he clear implication of the ADA's statutory and regulatory language with regard to … undue hardship is that an employer will violate the ADA by rejecting ... a proposed accommodation without first conducting an analysis to determine whether the proposed accommodation is reasonable and whether it really presents an undue hardship. ... In order to withstand judicial scrutiny, the employer's undue hardship defense will have to have a strong factual basis and be free of speculation or generalization about the nature of the individual's disability or the demands of a particular job.

*Bryant*, 923 F.Supp. at 740-741 (internal citation omitted).

When raising the defense, the burden is on the employer "to perform a cost-benefit analysis ... [and to] analyze the hardship sought to be imposed through the lens of factors listed in the regulations, which include consideration of the industry to which the defendant belongs as well as the individual characteristics of the particular defendant-employer." *Borkowski v. Valley Central School District*, 63 F.3d 131, 139 (2d Cir. 1995).  No such cost-benefit analysis has occurred here.

To research options for providing sign language interpretation, the human resources manager for the Frederick facility searched online, spoke to a friend who was a sign language interpreter, and spoke to a representative at Purple Language Services, the vendor that provides Defendant with interpretation services.  (PX3 Hofmann 43, l. 1-19).  Her online research consisted only of going to the Maryland School for the Deaf's website and receiving a newspaper from "one of the deaf associations."  (*Id.* at 43, l. 20 to p. 44, l. 10).  The conversation with her friend who was a sign language interpreter proved fruitless, as did the conversation with the vendor.  (*Id*. at 45, l. 3-9).

Defendant has only contacted one vendor, Purple Language Services, regarding the cost and availability of sign language interpretation.  (*Id.* at 221, l. 21 to p. 222, l. 8).  It never determined if it could receive a discount from that vendor for the purchase of services in bulk and it has not contacted any government agencies to see if a program or subsidy exists to offset the cost of providing a sign language interpreter.  (*Id.* at 221, l. 21 to p. 222, l. 8; p. 227, l. 16 to p. 228, l. 10).

In support of its motion, Defendant has provided a vaguely worded affidavit from Purple Language Service's representative stating, "Purple Language Service's rates for sign language

interpretation are *similar* to those of other *national* companies that provide sign language interpretation services operating in Maryland."  (Defendant's Exhibit R at 7)(italics added).  This affidavit is insufficient to create a material issue of fact regarding the hardship defense.  The affidavit does not state that that there is no *local* or *statewide* provider of sign language interpretation that has lower prices.  It states only that the competitor's prices are "similar" without disclosing the identities of the competitors, the terms upon which they provide services or the prices they actually charge.  *Id.*  The affidavit is conclusory, vague and does not disclose other available options.

Birnbaum Interpreting Services (BIS), a vendor within the state of Maryland, provides video remote interpretation (VRI),[26] which is easier to schedule and more cost effective than in-person interpretation.  (PX14 http://www.minnesotahelp.org/Public/details.aspx?AgencyID= 6118&LinkID=AE556E92-2C64-4BB7-B8A0-F80B88739414) hereinafter, "PX14 BIS").  Video remote interpretation is interpretation conducted through a video conference.  (*Id.* at 1).  The interpreter remains in his or her office and provides the interpretation through web cams and an internet connection.  (*Id*.)  The customer need only have video conferencing equipment and high-speed internet.  (*Id*. at 2).  The vendor is able to provide technical support for the customer if necessary.  (*Id.*)  VRI is available on demand without advanced scheduling.  (*Id.* at 1-2).  The price is $3.00 a minute with only a 15-minute minimum; however, discounted monthly packages are available.  (*Id.*)  VRI is widely available through numerous other vendors.  (*see generally* www.google.com search term: video remote interpreting).  Using VRI, a 15 minute start-up meeting could be interpreted for $45.00, a far cry from the $140.00 to $160.00 charged by Purple Language Services.

---

[26] Video Remote Interpretation differs from Video Relay Service (*see* Docket 19-1 at 19-20 of 44) in that VRI can be used to interpret a meeting whereas VRS can only be used to translate a phone call.

Defendant, without explaining its calculations, argues, "at a minimum, hiring an interpreter on a daily basis for a year would cost Defendant over $50,000, nearly twice the amount of Mr. Scrivnor's annual salary." (Docket 19-1 at 40 of 44). But its human resources manager, Uma Hoffmann, testified that the cost would be would be 1.5 times Scrivnor's Salary. (PX3 Hofmann 95, l. 16-21; p. 96, l. 1-4). Defendant does not explain the increase. Defendant also does not disclose Scrivnor's annual salary including bonuses and benefits, its calculation of how many hours of interpretation are necessary, or the cost of the interpretation it is already providing. There are simply no facts before the Court to support Defendant's figures. Accordingly, the Commission is entitled to summary judgment on the issue of undue hardship.

Assuming, for the sake of argument Defendant is able to prove that the accommodation would cost twice Scrivnor's annual salary, or over $50,000.00 a year, this would not be a material issue of fact. Defendant supports its argument with cases holding that an employer is not required to hire an additional employee, create a new position, or hire another employee to perform an essential function of the position. (Docket 19-1 at 40-41). However, when the employee can perform the essential functions of the job, hiring an aide an assistant or interpreter will not be an undue hardship. In *Borkowski*, 63 F.3d 131, 142-143 the court held "there is nothing inherently unreasonable or undue in the burden that an employer would assume by providing an assistant to an employee with disabilities … in the absence of evidence regarding school district budgets, the cost of providing an aide of this sort, or any like kind of information, we are unable to conclude that unreasonableness or undue hardship has been established, and we certainly cannot say that either has been established as a matter of law."

An employer cannot prove an undue hardship merely by comparing the cost of the accommodation to the employee's salary. 29 C.F.R. 1630 App. at §1630.15(d)(5) Defenses to

Making a Reasonable Accommodation.  In *Picinich v. United Parcel Service*, 321 F.Supp .2d

485, 509-510 (N.D.N.Y. 2004), the court held that the Defendant did not establish undue

hardship by submitting evidence that it would cost $30,000.00 to $90,000.00 to relocate an

employee.  The court found that "UPS has claimed a financial hardship, but has not submitted

evidence of its overall financial resources in order to allow a meaningful consideration of same

in relation to the alleged financial burden involved in accommodating Picinich."  (*Id.*).

There is a statutory requirement to analyze an undue hardship defense in light of the

employer's resources.  The ADA lists the following factors for consideration in determining if an

accommodation would impose an undue hardship:

> (i) the nature and cost of the accommodation needed;
> (ii) the overall financial resources of the facility or facilities involved in the
> provision of the reasonable accommodation; the number of persons employed at
> such facility; the effect on expenses and resources, or the impact otherwise of
> such accommodation upon the operation of the facility;
> (iii) the overall financial resources of the covered entity; the overall size of the
> business of a covered entity with respect to the number of its employees; the
> number, type and location of its facilities; and
> (iv) the type of operation or operations of the covered entity, including the
> composition, structure, and functions of such entity; the geographic separateness,
> administrative, or fiscal relationship of the facility or facilities in question to the
> covered entity.

42 U.S.C. § 12111(9).  Other than the affidavit from Purple Language Services, Defendant has

not put forth evidence regarding any of these statutory factors.

When this matter is analyzed under the statutory factors, the evidence against undue

hardship is overwhelming.  Defendant has three billion dollars in annual sales.  (PX3 Hofmann at

22, l. 7-11).  Taking the facts in the light most favorable to Defendant, if it is assumed that sign

language interpretation would cost $60,000 a year, then providing Scrivnor an interpreter will

amount to only .002% of annual sales.  For an employer with one million dollars in annual sales,

.002% would amount to $20.00.  If an employer could prove undue hardship solely upon proof

that an accommodation would cost an amount equivalent to .002% of annual sales, an

accommodation as basic as a chair with lumbar support could constitute an undue hardship.

Accordingly, judgment as a matter of law against Defendant on the issue of undue hardship is

warranted.

Defendant also argues that providing sign language interpretation on a daily basis would

be a hardship because it is "administratively difficult to implement."  (Docket 19-1 41 of 44).

This is untrue.  Defendant has represented to the court that it now provides interpreters for most

scheduled trainings attended by Mr. Scrivnor.  (Docket 19-1 at 24 of 44).  Clearly, the

accommodation is not difficult to implement if implementation has already occurred.

Scheduling an interpreter for startup meetings, departmental meetings and safety

meetings is very straightforward.  Startup meetings occur every workday at 1:00 p.m.  (PX9

Martinez at 26, l. 7- 16).  Defendant is capable of scheduling safety trainings immediately after

the start-up meetings.  (PX5 Williams at 31, l. 13 to p. 32, line 21; PX9 Martinez at 28, l. 7 -12).

Defendant also typically holds departmental meetings between 1:00 and 2:00 p.m.  (PX5

Williams at 32, l. 3-14).  Accordingly, the key meetings will be covered simply by scheduling a

sign language interpreter for 1:00 p.m.

Defendant bases its case for financial and administrative hardship only on information

provided to it from Purple Language Services.  If Defendant were to use video relay

interpretation from another vendor, it could reduce costs and ease administrative burdens by

scheduling interpretation on demand.  (PX14 BIS).  Because VRI can be purchased in fifteen-

minute increments, as opposed to the two-hour minimum required by Purple Language Services,

it would not cost $160.00 a day to translate startup meetings.  *Id.*  Defendant could continue

using Purple Language Services for the remaining meetings, if $3.00 a minute would not be a cost savings for longer meetings.  The affidavit provided by Purple Language Services is conclusory and does not explain why translation on these terms would not be possible.  For this reason, it does not create a material issue of fact.

To escape the duty to provide an accommodation the employer must show not just a hardship, but an *undue* hardship.  Defendant's proffered hardships, increased cost and administrative difficulty, are burdens intrinsic to all ADA compliance.  The "essence" of reasonable accommodation involves changing "standard operating procedure." *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir.1992). "All antidiscrimination statutes, from Title VII to the ADA impose costs on employers." *EEOC  v. Sara Lee Corp.,*  237 F.3d 349, 355 (4th Cir. 2001).

"'Undue hardship,' like 'reasonable' accommodation, is a relational term: the costs that the employer must assume are measured in relation to the benefits of the accommodation, including the societal benefits of reducing dependency and nonproductivity." *Ransom v. State of Arizona Bd. of Regents,* 983 F. Supp. 895, 901 (D. Ariz 1997)(*citing Stone v. Mount Vernon,* 118 F.3d 92, 98-100 (2nd Cir.1997)).  A cost that must be considered is the potential for injury to Scrivnor or some other form of mishap.  Defendant emphasizes an ethic of safety first.  (PX10 Simpson at 35, l. 13-18).  Defendant cannot plausibly deny that the safety trainings are a principal line of defense against employee injury.  Should a preventable injury occur, the costs could easily exceed the cost of sign language interpretation.  Accordingly, summary judgment on the issue of undue hardship is warranted.

IV.     <u>CONCLUSION</u>

The undisputed material facts show that Scrivnor is not granted equal participation in meetings and that Defendant's undue hardship defense is based on a conclusory affidavit and unsupported figures.  Summary judgment in the Plaintiff's favor on these issues is appropriate. Plaintiff further requests that the Court deny Defendant's motion for summary judgment and allow this matter to proceed to trial on all remaining issues.


Respectfully submitted,


P. David Lopez
General Counsel


GWENDOLYN YOUNG REAMS
Associate General Counsel

/S
_____
DEBRA M. LAWRENCE
Regional Attorney

/S
_____
MARIA SALACUSE
Acting Supervisory Trial Attorney
Federal Bar No. 15562

/S
_____
ERIC S. THOMPSON
Trial Attorney

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
10 S. Howard Street, 3rd Floor
Baltimore, Maryland  21201
(410) 209-2322 (phone)
(410) 962-4270 (fax)